# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|   |   |   |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| IHEARTMEDIA, INC., *et al*., | § | Case No. 18-31274 (MI) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |

## IHEART'S MOTION FOR LEAVE TO APPEAL

### I.      SUMMARY OF ARGUMENT

1.      A district court should grant leave to appeal an interlocutory bankruptcy court order when

    (1)    a controlling issue of law is involved;

    (2)    the question is one where there is substantial ground for difference of opinion; and

    (3)    an immediate appeal would materially advance the ultimate termination of the litigation.

In this case, Debtor iHeart Media + Entertainment, Inc. ("iHeart") has met the requirements. iHeart seeks a ruling from the district court as to whether complaints of harassment and discrimination that do not involve the plaintiff or the plaintiff's alleged harasser are relevant to a defendant's *Ellerth-Faragher* defense to a sexual harassment claim.

2.      This is a controlling legal issue that does not require evaluation of the specific facts or evidence in this case, and the decision in this case could broadly impact many future harassment cases. Further, there is substantial ground for difference of opinion with the bankruptcy court because multiple Courts of Appeals, district courts from other jurisdictions, and district courts in the Fifth Circuit have issued rulings conflicting with the bankruptcy court's holding. In fact, iHeart could not locate, and the Plaintiff did not cite, a single federal court

**Exhibit B**

opinion reaching the same conclusion as the bankruptcy court in this case. Finally, an immediate appeal would materially advance the ultimate termination of the litigation by preventing substantial irrelevant and costly discovery, allowing for a quicker trial, shortening the trial itself, and avoiding the potential for a new trial resulting from reversible error.

3.      This Court should grant leave for iHeart to appeal.

## II.      FACTUAL BACKGROUND

4.      Plaintiff Samantha Springs has alleged claims for *quid pro quo* and hostile environment sexual harassment[1] against iHeart. Ms. Springs was the General Sales Manager for iHeart's office in New Orleans, Louisiana for less than six months. On February 1, 2018, Springs was terminated by Michael Hudson (Area President of iHeart) and Eddie Martiny (Region President of iHeart) for poor job performance and ineffective leadership. Although Ms. Springs did not notify iHeart of any alleged harassment until after she was terminated, Ms. Springs claims that her supervisor, Steve McNair, sexually harassed her.[2]

5.      McNair was the New Orleans Market President. After Springs made her claim of harassment to iHeart, McNair admitted that he had a prior intimate, sexual relationship with Ms. Springs. McNair was terminated by iHeart shortly thereafter. Ms. Springs and McNair both acknowledge that they had an intimate, sexual relationship while they were both employed at

---

[1] Ms. Springs' quid pro quo claim was technically asserted as "quid pro quo gender discrimination," but that is not a recognized discrimination claim. Further, Ms. Springs could not succeed on a gender discrimination claim because such a claim requires Ms. Springs to prove that her replacement was a member of the opposite sex and Ms. Spring was replaced by a woman, Tony Skipper. *Turner v. Jackson State Univ.*, 3:04CV623LS, 2006 WL 1139931, at *1 (S.D. Miss. Apr. 25, 2006). Thus, iHeart has assumed that Ms. Springs was actually asserting a claim for "quid pro quo sexual harassment" and Ms. Springs has not disagreed with that assumption.

[2] Ms. Springs also complained about a single joke told by Mike Hudson in her presence, but this could not support a valid complaint of harassment. There is no plausible connection between the joke and McNair's alleged harassment or Springs' termination. Nor does Ms. Springs assert such a connection. Further, a single instance of such conduct by Hudson cannot amount to harassment. The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004). Courts in the Fifth Circuit routinely grant summary judgment to defendants in harassment cases alleging far more severe and pervasive than a single joke. *Id.* at 325-29 (listing cases).

iHeart. They both acknowledge that they mutually agreed to end the relationship some time in November 2017 and that McNair decided to end it (although Ms. Springs has given conflicting statements about who ended the relationship). They also acknowledge that they hid (or at least did not disclose) their relationship. However, Ms. Springs and McNair disagree about whether his sexual conduct towards her was welcomed by Ms. Springs.

6.      In response to Ms. Springs' discovery requests, iHeart disclosed that iHeart never received any other complaints of harassment related to McNair. And iHeart also disclosed that it has not received any complaints of sexual harassment, gender discrimination, or quid pro quo sexual harassment from Jan 1, 2017 to present for the New Orleans office where McNair and Ms. Springs were employed. However, iHeart objected to any interrogatories or document requests that sought information about complaints of harassment or discrimination that did not involve Ms. Springs or McNair, Ms. Springs' alleged harasser.

7.      On March 17, 2020, Samantha Springs filed a motion to compel with regard to one interrogatory and two document requests seeking discovery of company-wide complaints related to harassment and sexual discrimination asserted against iHeart employees other than McNair and Ms. Springs. The motion did not cite any case law supporting the relevance of such complaints to a sexual harassment complaint. Instead, Ms. Springs argued that iHeart's assertion of an *Ellerth-Faragher* defense made other complaints relevant because an element of the defense required a showing that iHeart took reasonable care to prevent any harassing behavior and to promptly correct harassing behavior once notified of it.

8.       On April 7, 2020, iHeart filed a response that identified several district court cases rejecting Ms. Springs' argument of the relevance of other harassment complaints. Springs filed a reply on April 10, 2020. On April 13, 2020, the Court granted, in part, the motion to

compel as to other complaints of alleged harassment and discrimination in Mississippi, Texas, Alabama, and Louisiana. (Order, Docket No. 4060, Ex. A.) At the hearing, the Court explained that it believed complaints against iHeart employees other than McNair were relevant under *Casiano v. AT&T Corp.*, 213 F.3d 278 (5th Cir. 2000):

> But because of my reading of *Casiano* and because there is a burden in order to deal with this [*Ellerth-Faragher*] defense, I need to decide whether it was swift and effective, and I don't believe that the affirmative defense works just by looking at the one situation. That's not instructional from the Fifth Circuit.

(Transcript, Ex. B at 20.) The Court denied iHeart's motion to amend the order on April 23, 2020 and ordered that iHeart produce the compelled information within 14 days (Order, Docket No. 4068, Ex. C.)

## III.    QUESTION PRESENTED

Are complaints of harassment or sexual discrimination that do not involve the plaintiff or the plaintiff's alleged harasser relevant to a defendant's *Ellerth-Faragher* defense to a hostile work environment sexual harassment claim?

## IV.    RELIEF SOUGHT

iHeart asks that the Court grant leave to appeal and reverse the portion of the bankruptcy court's order entered April 13, 2020 [Docket No. 4060] that compelled iHeart to produce information or documents on harassment and sexual discrimination complaints that do not involve Ms. Springs or McNair, the alleged harasser.

## V.    REASONS FOR GRANTING LEAVE TO APPEAL

9.    A district court can grant leave to appeal an interlocutory order of a bankruptcy court under 58 U.S.C. § 158(a)(3). However, the statute "does not indicate the standard a district court should use in determining whether to grant leave to appeal." *Matter of Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991). As a result, district courts in the Fifth Circuit (and in other

jurisdictions) have adopted the standard for interlocutory appeals from the district court to a court of appeals under 28 U.S.C. § 1292(b). *Id.*; *Rivas v. Weisbart*, 4:19-CV-774, 2019 WL 5579726, at *2 (E.D. Tex. Oct. 28, 2019); *In re Delta Produce*, BR 12-50073-A998, 2013 WL 3305537, at *1 (W.D. Tex. June 28, 2013); *In re Cent. Louisiana Grain Co-op., Inc*., 489 B.R. 403, 407–08 (W.D. La. 2013); *DuPree v. Kaye*, CIV A 307-CV-0768-B, 2008 WL 294532, at *2 (N.D. Tex. Feb. 4, 2008). Section 1292(b) requires three elements:

(1)   a controlling issue of law must be involved;

(2)   the question must be one where there is substantial ground for difference of opinion; and

(3)   an immediate appeal must materially advance the ultimate termination of the litigation.

28 U.S.C. § 1292(b); *Dupree*, 2008 WL 294532 at *2.

10.   The Fifth Circuit has repeatedly permitted appeals of interlocutory discovery orders when the Section 1292(b) requirements are met. *See Cazorla v. Koch Foods of Mississippi, L.L.C*., 838 F.3d 540 (5th Cir. 2016); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721 (5th Cir. 1980); *State of Tex. v. U.S. Steel Corp*., 546 F.2d 626 (1977); *Hyde Const. Co. v. Koehring Co*., 455 F.2d 337 (1972); *Garner v. Wolfinbarger*, 430 F.2d 1093 (1970).

11.   In this case, the Court should grant leave to appeal because this issue meets the requirements for an appeal of an interlocutory order.

**A.    The issue raised in iHeart's appeal is a controlling issue of law.**

12.   A controlling question of law is a legal question that can be reviewed quickly and cleanly without having to study the record. *In re Delta Produce*, 2013 WL 3305537, at *2; *Ryan v. Flowserve Corp*., 444 F. Supp. 2d 718, 722–23 (N.D. Tex. 2006). It does not involve the application of settled law to fact. *Ryan*, 444 F. Supp. 2d at 722-23. It involves a question that could have precedential value for a large number of cases, rather than being tied to the facts of a

specific case. *Id.*

13.     The issue for which iHeart seeks review is a pure legal question that fits the requirements because it involves the type of evidence that is relevant to the *Ellerth-Faragher* defense to a hostile work environment sexual harassment claim. The *Ellerth-Faragher* affirmative defense to a hostile work environment sexual harassment claim involves proving two elements:

    1)    The employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and;

    2)    The plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer, or to otherwise avoid harm.

*Blanton v. Newton Associates, Inc.*, 593 Fed. Appx. 389, 390 (5th Cir. 2015). The question raised by this appeal is whether the first element of the defense solely involves consideration of facts relevant to the plaintiff and alleged harasser or requires consideration of harassment and sexual discrimination complaints by others against employees other than the plaintiff's harasser. Indeed, the explanation for the bankruptcy's court's decision frames the issue as a legal one based on its interpretation of *Casiano v. AT&T Corp.*, 213 F.3d 278 (5th Cir. 2000):

But because of my reading of *Casiano* and because there is a burden in order to deal with this [*Ellerth-Faragher*] defense, I need to decide whether it was swift and effective, and I don't believe that the affirmative defense works just by looking at the one situation. That's not instructional from the Fifth Circuit.

(Transcript, Ex. B at 20.) Nothing about the ruling indicates it is based on the specific facts of this case.

14.     The controlling nature of this issue is further illustrated by *Casiano* and other opinions from the Fifth Circuit evaluating summary judgments granted by district courts based on the *Ellerth-Faragher* defense. *Casiano* held that AT&T met its summary judgment burden based on the *Ellerth-Faragher* defense without considering complaints of harassment beyond the

Plaintiff's complaint. *Casiano v. AT&T Corp.*, 213 F.3d at 284-86. The Fifth Circuit's analysis of whether AT&T's policy was "swift and effective" (i.e. reasonable steps taken to remedy the harassment) in *Casiano* concerned only facts related to the specific plaintiff's complaint and the alleged harasser. *Id.*

15. Likewise, the Fifth Circuit routinely upholds grants of summary judgment based on the *Ellerth-Faragher* defense when the defendant proves that it responded reasonably to the *specific harassment* reported by the plaintiff, and the plaintiff did not reasonably report the harassment. *Giddens v. Cmty. Educ. Centers, Inc*., 540 Fed. Appx. 381, 389 (5th Cir. 2013); *McDaniel v. Shell Oil Co*., 350 Fed. Appx. 924, 926–27 (5th Cir. 2009); *Williams v. Barnhill's Buffet Inc*., 290 Fed. Appx. 759, 763 (5th Cir. 2008); *Meshell v. Noble Drilling Services, Inc*., 255 Fed. Appx. 928, 928–29 (5th Cir. 2007); *Moayedi v. Compaq Computer Corp*., 98 Fed. Appx. 335, 338 (5th Cir. 2004). Conversely, when the Fifth Circuit reverses a summary judgment granted by the district court, it bases its decision on circumstances *specific to the plaintiff and harasser*. *See, e.g. Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 482 (5th Cir. 2008) (holding that a fact issue existed as to whether the employer should have responded to the alleged harassment sooner); *Donaldson*, 335 Fed. Appx. at 505 (defendant failed to prove plaintiff unreasonably delayed in reporting the harassment as a matter of law); *Pullen v. Caddo Par. Sch. Bd*., 830 F.3d 205, 210 (5th Cir. 2016) (holding that a fact issue existed as to whether the policy was reasonably promulgated to plaintiff and harasser). None if these cases even mention harassment complaints that do not involve the plaintiff or the alleged harasser.

16. A defendant bears the burden of proof on the *Ellerth-Faragher* defense. Thus, if the law requires an examination of a defendant's handling of harassment complaints that do not involve the plaintiff or alleged harasser, then a defendant seeking summary judgment must

present evidence related to other harassment complaints to meet its burden. Thus, if the bankruptcy court's ruling is correct, it has broad implications for Fifth Circuit jurisprudence because it would mean that courts in the Fifth Circuit—in the cases cited above and others—are routinely mis-analyzing summary judgments on the *Ellerth-Faragher* defense. Conversely, if the bankruptcy court's ruling is incorrect, then a clear published[3] legal decision on the issue would impact numerous future hostile work environment sexual harassment cases in which the defense is raised.

**B.     There is substantial ground for a difference of opinion from the legal ruling of the bankruptcy court.**

17.     Courts traditionally will find a substantial ground for difference of opinion "if a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Coates v. Brazoria County Tex.*, 919 F. Supp. 2d 863, 868–69 (S.D. Tex. 2013) (quotations omitted); *Ryan*, 444 F. Supp. 2d at 723–24. (same); *In re Delta Produce*, 2013 WL 3305537, at *3.

18.     Here, this issue meets more than one of the standards for a substantial ground for a difference of opinion. While the Fifth Circuit has never squarely addressed the issue of whether other harassment complaints or incidences are relevant in relation to the *Ellerth-Faragher* defense, two other circuit courts have both held that other complaints were not relevant to a sexual harassment suit. *Burleson v. Sprint Pcs Group*, 123 Fed. Appx. 957, 960 (10th Cir. 2005); *Williams v. City of Kansas City, Mo*, 223 F.3d 749, 754–55 (8th Cir. 2000).

19.      Further, multiple district courts within the Fifth Circuit have held—albeit in

---

[3] Indeed, the bankruptcy court noted the absence of a published decision from a Fifth Circuit court specifically addressing this issue. (Transcript, Ex. B at 20.)

unpublished decisions—that other complaints not involving the alleged harasser are irrelevant. *Boyd v. Am. Airlines, Inc*., 3-01-CV-2230-D, 2002 WL 32360294, at *1–2 (N.D. Tex. Oct. 17, 2002) (specifically rejecting the argument that *Ellerth-Faragher* made other complaints relevant); *Smith v. DeTar Hosp. LLC*, CIV.A. V-10-83, 2011 WL 6217497, at *4–6 (S.D. Tex. Dec. 14, 2011) (holding evidence of other incidents relating to another harasser not relevant to *Kolstad*[4] defense to punitive damages that is substantially similar to *Ellerth-Faragher*); *see also Pritchard v. Merakey Pennsylvania*, 18-CV-1403, 2019 WL 3884239, at *1 (W.D. La. Aug. 15, 2019) (denying plaintiff's motion to compel documents related to complaints by alleged harassers other than the plaintiff's harasser). In addition, some district courts from other jurisdictions have reached the same conclusion. *Jordan v. R&O Aurora, Inc*., 06 C 6452, 2008 WL 4812655, at *1-2 (N.D. Ill. Oct. 28, 2008); *Spina v. Our Lady of Mercy Med. Ctr*., 97 CIV 4661 (RCC), 2001 WL 630481, at *3 (S.D.N.Y. June 7, 2001).

20.     In fact, all prior federal case law iHeart could locate on the issue consistently holds that complaints against employees other than the plaintiff's harasser are irrelevant to a harassment claim or an applicable defense. The only federal court iHeart could identify that reached the opposite conclusion is the bankruptcy court in this case. Thus, this issue meets the requirement that there be a substantial ground for a difference of opinion.

C.     **An immediate appeal will materially advance the ultimate termination of the litigation**.

21.     In evaluating this criterion, "a district court is to examine whether an immediate

---

[4] In *Kolstad*, the Supreme Court detailed the necessary proof to satisfy the statutory language for punitive damages in discrimination cases and established a good faith affirmative defense. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 533–46, 119 S. Ct. 2118, 2123–25, 144 L. Ed. 2d 494 (1999). The Fifth Circuit has found "good faith" efforts to exist where the employer "had a well-publicized policy forbidding sexual harassment, gave training on sexual harassment to new employees, established a grievance procedure for sexual harassment complaints, and initiated an investigation of the plaintiffs' complaints." *Alaniz v. Zamora-Quezada*, CIV.A. M-03-108, 2005 WL 2179793, at *8 (S.D. Tex. Sept. 8, 2005). The requirements for this affirmative defense essentially track those for *Ellerth-Faragher*.

appeal would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly." *Coates*, 919 F. Supp. 2d at 867 (quotation omitted). In evaluating whether an interlocutory appeal will materially advance the ultimate termination of the litigation, the key factor for this element is whether an interlocutory appeal could "speed up the litigation." *Ryan*, 444 F. Supp. 2d at 723.

22.     This requirement is also met in this case. It is already clear that the discovery compelled by the bankruptcy court's order will lead to substantially more discovery related to other complaints of harassment not involving Ms. Springs or her alleged harasser. The bankruptcy court's order specifically contemplates permitting further discovery based on the compelled information: "[t]he parties may request a modification of the scope … following the receipt of responses."[5] (Transcript, Ex. B at 20-21.) Further, Ms. Springs' counsel has already sought iHeart's counsel's agreement to an extension of the trial date and discovery deadline for several additional months to accommodate depositions of any witnesses disclosed as a result of complying with the bankruptcy court's order. (Correspondence from Ms. Springs' counsel dated April 20, 2020 and proposed scheduling order, Ex. D).

23.     In addition, the bankruptcy court's ruling indicates that these other complaints of harassment will be part of the trial itself because the bankruptcy court believes evaluating iHeart's response to such complaints is necessary to the determination of the *Ellerth-Faragher* defense. (Transcript, Ex. B at 20 L20-25; 21 L1-8.). As stated by the bankruptcy court above: "… I don't believe that the affirmative defense works just by looking at the one situation. That's not instructional from the Fifth Circuit." (*Id.*) Thus, the bankruptcy court's ruling will almost certainly lengthen the trial and create the reasonable probability that the trial will be subject to

---

[5] One reason such modification can be made is to permit Ms. Springs to expand the scope of complaints to further delve into complaints made by other employees in additional offices unrelated to the department where Ms. Springs worked or the alleged harasser. (Transcript, Ex. B at 20-21.)

reversible error through the consideration of evidence of complaints not involving the alleged harasser and multiple other locations.

24.      Granting leave to appeal and addressing this issue now is likely to eliminate the need for substantial discovery, bring the case to trial faster, shorten the trial itself, and eliminate potential grounds for a new trial. This is precisely the type of situation in which an appeal of an interlocutory order is warranted.

## VI.      CONCLUSION

Based on the foregoing analysis, iHeart requests that the Court grant leave to appeal the bankruptcy court's order, Docket No. 4060.

 May 6, 2020

*/s/ Brian W. Zimmerman*
Brian W. Zimmerman
State Bar No. 00788746
FBN: 18979
**SPENCER FANE LLP**
3040 Post Oak Blvd., Suite 1300
Houston, Texas 77056
Telephone: 713-212-2651
Facsimile: 713-963-0859
Email: bzimmerman@spencerfane.com

*Co-Counsel to the Reorganized Debtor*

## Certificate of Service

I certify that on the 6th of May 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States District Court for the Southern District of Texas.

*/s/ Brian W. Zimmerman*
Brian W. Zimmerman

-11-

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
04/13/2020

| | | |
|---|---|---|
| **IN RE:** | § | |
| **IHEARTMEDIA, INC.,** *et al* | § | **CASE NO: 18-31274** |
| | § | |
| **IHEARTCOMMUNICATIONS, INC.** | § | **CASE NO: 18-31273** |
| | § | |
| **IHEARTMEDIA CAPITAL I, LLC** | § | **CASE NO: 18-31275** |
| | § | |
| **IHEARTMEDIA CAPITAL II, LLC; fka** | § | **CASE NO: 18-31276** |
| **CLEAR CHANNEL CAPITAL II, LLC** | § | |
| | § | |
| **AMFM BROADCASTING LICENSES LLC** | § | **CASE NO: 18-31277** |
| | § | |
| **AMFM BROADCASTING, INC.** | § | **CASE NO: 18-31278** |
| | § | |
| **AMFM OPERATING, INC.** | § | **CASE NO: 18-31279** |
| | § | |
| **AMFM RADIO LICENSES, LLC** | § | **CASE NO: 18-31280** |
| | § | |
| **AMFM TEXAS BROADCASTING, LP** | § | **CASE NO: 18-31281** |
| | § | |
| **AMFM TEXAS LICENSES, LLC** | § | **CASE NO: 18-31282** |
| | § | |
| **AMFM TEXAS LLC** | § | **CASE NO: 18-31283** |
| | § | |
| **CAPSTAR RADIO OPERATING** | § | **CASE NO: 18-31284** |
| **COMPANY** | § | |
| | § | |
| **CAPSTAR TX, LLC** | § | **CASE NO: 18-31285** |
| | § | |
| **CC BROADCAST HOLDINGS, INC.** | § | **CASE NO: 18-31286** |
| | § | |
| **CC FINCO HOLDINGS, LLC** | § | **CASE NO: 18-31287** |
| | § | |
| **CC LICENSES, LLC** | § | **CASE NO: 18-31288** |
| | § | |
| **CHRISTAL RADIO SALES, INC.** | § | **CASE NO: 18-31289** |
| | § | |
| **CINE GUARANTORS II, INC.** | § | **CASE NO: 18-31290** |
| | § | |
| **CITICASTERS CO.** | § | **CASE NO: 18-31291** |
| | § | |
| **CITICASTERS LICENSES, INC.** | § | **CASE NO: 18-31292** |

**Exhibit A**

| | § | |
|---|---|---|
| **CLEAR CHANNEL BROADCASTING LICENSES, INC.** | § | **CASE NO: 18-31293** |
| | § | |
| **CLEAR CHANNEL HOLDINGS, INC.** | § | **CASE NO: 18-31294** |
| | § | |
| **CLEAR CHANNEL INVESTMENTS, INC.** | § | **CASE NO: 18-31295** |
| | § | |
| **CLEAR CHANNEL METRO, INC.** | § | **CASE NO: 18-31296** |
| | § | |
| **CLEAR CHANNEL MEXICO HOLDINGS, INC.** | § | **CASE NO: 18-31297** |
| | § | |
| **CLEAR CHANNEL REAL ESTATE, LLC** | § | **CASE NO: 18-31298** |
| | § | |
| **CRITICAL MASS MEDIA, INC.** | § | **CASE NO: 18-31299** |
| | § | |
| **IHEARTMEDIA + ENTERTAINMENT, INC.** | § | **CASE NO: 18-31300** |
| | § | |
| **IHEARTMEDIA MANAGEMENT SERVICES, INC.; aka CLEAR CHANNEL MANAGEMENT SERVICES, L.P.; aka CLEAR CHANNEL MANAGEMENT SERVICES, INC.** | § | **CASE NO: 18-31301** |
| | § | |
| **IHM IDENTITY, INC.** | § | **CASE NO: 18-31302** |
| | § | |
| **KATZ COMMUNICATIONS, INC.** | § | **CASE NO: 18-31303** |
| | § | |
| **KATZ MEDIA GROUP, INC.** | § | **CASE NO: 18-31304** |
| | § | |
| **KATZ MILLENNIUM SALES & MARKETING, INC.** | § | **CASE NO: 18-31305** |
| | § | |
| **KATZ NET RADIO SALES, INC.** | § | **CASE NO: 18-31306** |
| | § | |
| **M STREET CORPORATION** | § | **CASE NO: 18-31307** |
| | § | |
| **PREMIER NETWORKS, INC.; fka PREMIER RADIO NETWORKS, INC.** | § | **CASE NO: 18-31308** |
| | § | |
| **TERRESTRIAL RF LICENSING, INC.** | § | **CASE NO: 18-31309** |
| | § | |
| **TTWN MEDIA NETWORKS, LLC; fka METRO NETWORKS** | § | **CASE NO: 18-31310** |
| | § | |

COMMUNICATIONS, INC          §

                                      §

**TTWN NETWORKS, LLC; aka METRO**  §     **CASE NO: 18-31311**

**NETWORKS, INC.**                   §

                                      §     **Jointly Administered Order**

      **Debtor(s)**             §

                                      §     **CHAPTER 11**

                                      §

                                      §

## ORDER ON DISCOVERY MATTERS
### (ECF NO. 4044 AND ECF NO. 4046)

For the reasons set forth on the record on this date, the Court orders:

1. Notwithstanding the Court's Order Limiting the Scope of Depositions and Imposing Appropriate Relief, iHeart may ask questions during Mr. McNair's deposition that exceed the limits imposed by the Court's order. This authorization does not allow the questioner to ask questions in a manner that are designed to intimidate, harass or embarrass Ms. Springs. The Court provided certain guidance during today's hearing.

2. iHeart must respond to questions 15, 37 and 56 of Ms. Spring's discovery, subject to the following:

    a. iHeart may assert appropriate privileges.

    b. iHeart is permitted to limit is responses to matters where alleged wrongful conduct occurred, in whole or in part, in Alabama, Mississippi, Louisiana and Texas.

    c. iHeart is permitted to limit is responses to the period from 3 years prior to Ms. Spring's first date of employment through 1 year following the termination of Ms. Spring's employment.

3. The parties may request a modification of the scope of discovery following the receipt of responses as set forth in paragraph 2 of this Order.

SIGNED **April 13, 2020.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

| | | |
|---|---|---|
| IN RE: | . | Case No. 18-31274 |
| | . | Chapter 11 |
| IHEARTMEDIA, INC. and | . | |
| OFFICIAL COMMITTEE OF | . | (Jointly administered) |
| UNSECURED CREDITORS OF IHEART, | . | |
| et al, | . | 515 Rusk Avenue |
| | . | Houston, TX  77002 |
| Debtors. | . | |
| | . | Monday, April 13, 2020 |
| . . . . . . . . . . . . . . . | . | 9:31 a.m. |

TRANSCRIPT OF MOTION TO COMPEL RESPONSES TO DISCOVERY FILED BY
CREDITOR SAMANTHA SPRINGS [4044];
AMENDED MOTION TO AMEND [4046]
**TELEPHONICALLY BEFORE THE HONORABLE MARVIN ISGUR**
**UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Jackson Walker LLP |
| | By:  JAMILA BRINSON, ESQ. |
| | ELIZABETH C. FREEMAN, ESQ. |
| | 1401 McKinney Street, Suite 1900 |
| | Houston, TX  77010 |
| | (713) 752-4200 |
| | |
| | Spencer Fane LLP |
| | By:  BRIAN WEIL ZIMMERMAN, ESQ. |
| | NICK REISCH, ESQ. |
| | 3040 Post Oak Boulevard, Suite 1300 |
| | Houston, TX 77056-6560 |
| | (713) 552-1234 |
| | |
| For Samantha Springs: | Walker & Patterson, PC |
| | By:  MIRIAM GOOTT, ESQ. |
| | JOHNIE J. PATTERSON II, ESQ. |
| | P.O. Box 61301 |
| | Houston, TX 77208 |
| | (713) 956-5577 |
| | |
| Audio Operator: | Courtroom ECRO Personnel |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46038 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Exhibit B**

2

1          (Proceedings commence at 3:33 p.m.)

2                THE COURT:  All right.  Good morning.  We are here in

3   the iHeartMedia case for two different motions.  I'm going to

4   take appearances on the telephone.  If anyone wishes to appear,

5   you'll need to press 5* on your phone.  The case number is

6   18-31274.

7                From 713-212-1234, who do we have on the telephone?

8                MS. BRINSON:  Good morning, Your Honor.  This is

9   Jamila Brinson from Jackson Walker appearing for iHeart, along

10  with my counsel, Brian Zimmerman, from Spencer Fane and Nick

11  Reisch with Spencer Fane also appearing on behalf of iHeart.

12               THE COURT:  Good morning, Ms. Brinson.

13               And who do we have on behalf of Ms. Springs?

14               MS. GOOTT:  Good morning, Your Honor.  Miriam Goott

15  on behalf of Ms. Springs, and Mr. Patterson is on, as well.

16               THE COURT:  Good morning, Mr. Patterson.  Do you want

17  to state your name for us, please.

18               MR. PATTERSON:  Yes, Your Honor.  Johnie Patterson

19  here on behalf of Ms. Springs.

20               THE COURT:  Mr. Patterson, you're way too faint.  Can

21  you get closer to your phone?

22               MR. PATTERSON:  Is that better, Your Honor?  Johnie

23  Patterson on behalf of Ms. Springs.

24               THE COURT:  Yes, sir.  Thank you.

25               And Ms. Freeman.

1              MS. FREEMAN:  Good morning, Your Honor.  Elizabeth
2  Freeman of Jackson Walker.  I am here to assist Ms. Brinson
3  (indiscernible) any arguments today.
4              THE COURT:  Thank you.  All right.  How did you all
5  want to proceed this morning?  Who wants to go first?
6  Ms. Brinson?  Mr. Patterson?  Ms. Goott?
7              MR. PATTERSON:  I think we're just going to handle
8  our argument on --
9              THE COURT:  I can't hear whoever's speaking.  There's
10 a male voice speaking.
11             MR. PATTERSON:  Ms. Goott is going to handle the
12 argument on both motions, Your Honor.
13             THE COURT:  Thank you.
14             Ms. Goott, did you want to begin or Ms. Brinson?  Go
15 ahead.
16             MS. GOOTT:  I'm happy to start, Your Honor.  This is
17 Miriam Goott.
18             THE COURT:  Perfect.  Go ahead, please.
19             MS. GOOTT:  We're starting at the -- on our motion to
20 compel.
21             THE COURT:  That's fine.
22             MS. GOOTT:  Can you hear me all right?
23             THE COURT:  Yes, ma'am.  I can hear you fine.
24             MS. GOOTT:  Okay.  Your Honor, iHeart objected to
25 Ms. Springs claim, and (indiscernible) defense, they say that

4

1  there's a policy in place to prevent this harassment as part of

2  their argument is that they have this policy in place.  And we

3  took a look at that policy, and we did take a look at the

4  effectiveness of the policy and whether or not this policy is

5  ignored.  And when it comes down to looking at this policy

6  (indiscernible).  And the (indiscernible) that they raised, the

7  Supreme Court says that this court has to look at the

8  reasonableness in both iHeart and their policy and preventing

9  (indiscernible) and for you to look at (indiscernible) and what

10 (indiscernible).

11         But the subject for today is reasonableness, and the

12 Supreme Court didn't give us a brightline rule for

13 reasonableness.  And as this -- as (indiscernible) affirmative

14 defense came into play, the courts have (indiscernible) changed

15 over time, and I think it's changed over time because the

16 courts have realized that the world has changed, and they look

17 and understand what it's like to be a woman in the workplace,

18 and they also understand that there are measures that employers

19 have to take to protect their employees, not just fire a boss

20 when he gets caught (indiscernible), but what is it they do to

21 prevent it.

22         And when you look at the cases over the last 20

23 years, at first, it was, okay, if one of these companies has a

24 policy, does the policy just exist?  Then, that's enough, and

25 the company is let off the hook.  (Indiscernible).  The policy

1   (indiscernible).

2           And then, as time changed, it was, well, the

3   existence of the policy, that shouldn't be enough.  We can make

4   sure that the employees actually have notice of this policy.

5           And as time changed and the world changed, courts

6   said, let's actually look at this policy.  What does it say?

7   What do we have here?

8           And now, it's it should be more, and I think

9   (indiscernible) going to look at more than just what's written

10  on this page.  And the Third Circuit did that.  Third Circuit

11  said, okay, let's look at the culture here, what is the

12  corporate culture, and what we want to look at is this policy

13  is iHeart's.  And then, they really look at it and see whether

14  or not this culture that allows for inappropriate parties and

15  jokes and women being subjected to a specific environment, we

16  look at that and we say (indiscernible).  It's happening around

17  the country, and I'm not sure that (indiscernible) anything

18  besides (indiscernible) and what happened (indiscernible).

19          And I just don't think that's right, and I don't

20  think that it is really any different than when we come to this

21  Court and say, Judge, this mortgage servicer violated your

22  order during a mortgage (indiscernible) -- or a discharge

23  injunction.  And I come on and I say they did this, and their

24  response is, Judge, (indiscernible) mortgage company liable

25  because we have policies in place to prevent this, and this is

6

just one guy that made a mistake, one guy in India that didn't
code the paperwork or the computer system properly, don't hold
us liable.

        This Court should know (indiscernible) after the last
two years.  It's the same argument that the big companies are
saying, don't hold us liable because we have policies in place
to prevent it and one person made a mistake.  And whether it's
a mortgage servicer or one employee in India that made a
mistake -- for iHeart, it's the manager in New Orleans that did
this -- we get to look at them globally.  It's one policy.
It's one company.

        And quite frankly, I'm not (indiscernible)
headquarters in San Antonio.  The man, according to their
responses to discovery, that terminated Ms. Springs is in San
Antonio.  Its headquarters, its corporate top guy that's making
this decision to terminate her.  And I think that if they're
going to raise this defense, then we're entitled to
(indiscernible) did he fire when they sued iHeart?  Who else
made complaints?  This gets to the heart of their defense, and
I think we're entitled to know it.

        And iHeart wants to know every time -- sorry, Your
Honor?

        THE COURT:  No, I thought you were finishing and I
had a couple questions for you.  I'll wait.

        MS. GOOTT:  Okay.  All I want to say is that iHeart

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

7

1  has requested in Ms. Springs's response to their question who

2  she's sued without any reference to time, any employer she's

3  sued for sexual harassment.  They have that information, we'd

4  like that information, too.

5          THE COURT:  There were three specific issues that you

6  raised in your motion.  Can you go through the three and tell

7  me how they are each proportionate and how they each go towards

8  a relevant question in the case.

9          MS. GOOTT:  (Indiscernible) the three discovery

10 requests?

11         THE COURT:  Correct.

12         MS. GOOTT:  Just let me pull it up so that I have it

13 right in front of me.  Okay.

14         THE COURT:  Which ECF are you looking at right now?

15         MS. GOOTT:  I'm sorry?

16         THE COURT:  Sorry, I just wanted to open it on my

17 screen, as well, so that I have it (indiscernible).

18         MS. GOOTT:  4044.

19         THE COURT:  Was your --

20         MS. GOOTT:  4044.

21         THE COURT:  All right.

22         MS. GOOTT:  All right.  So I'm on Page 2,

23 Interrogatory Number 15.  Here, we're asking for iHeart to

24 respond and let us know when they've been the subject of any

25 EOC investigation or any lawsuit or threatened lawsuit over

8

1  allegations of sexual harassment, discrimination, or quid pro

2  quo from 2014 to the present.  I believe that your question is

3  for me to explain how this is proportional and why it is

4  relevant.

5          THE COURT:  (Indiscernible), yeah.

6          MS. GOOTT:  All right.  So, first, this is entirely

7  relevant because this -- by letting -- by answering this

8  question, we will know (indiscernible).  All that we want to

9  know is how many complaints, against who the complaint was

10  made, so the individual's name and their title, and how it was

11  resolved.  This goes directly to refute their defense that they

12  have reasonable policies in place to prevent this harassment.

13  And (indiscernible) I know that in every city around the

14  country that there has been a woman since 2014 -- and the

15  reason I picked 2014 is because Ms. Springs was terminated in

16  2017, and I think that going back three years is a reasonable

17  amount of time.  I did offer to limit that because they wanted

18  to shorten it a little bit, but I was told that there's no time

19  period that is relevant.

20          But going back to 2014 gives you a three-year period

21  where I can show the Court they had 100 complaints by women

22  that said, "I refused to sleep with my boss at some point" or

23  "I did and then I terminated the relationship," and there are

24  no reasonable policies in place to prevent this type of

25  behavior.  And showing that this happens all over the country

9

1   and that it's pervasive allows me to show this Court that their

2   argument that their policy is reasonable to prevent the

3   behavior isn't reasonable.

4            THE COURT:  All right.  What's the next?

5            MS. GOOTT:  I'm sorry?

6            THE COURT:  I wanted to move to the next one that you

7   (indiscernible).

8            MS. GOOTT:  Yes, sir.

9            THE COURT:  Number 37, for example.

10           MS. GOOTT:  Yes.  All harassment complaints, internal

11  or external, made to iHeart since January 2014 about any iHeart

12  employee who is (indiscernible) a person in management or

13  leadership.  This was --

14           THE COURT:  This is, effectively, the same reason for

15  15?

16           MS. GOOTT:  Yes, sir.  Yes, sir.  It is just limiting

17  it to (indiscernible) didn't go to the EOC or didn't file a

18  lawsuit but complained to HR.  It's the same reasoning, same

19  timeframe.

20           And then, the last one is a request for production

21  requesting documents and communication wtih any third party who

22  conducted investigations related to harassment at iHeart since

23  January 1st, 2014.  And this goes back to whether or not they

24  had a reasonable policy.  So if, for exapmle, they had multiple

25  complaints made adn decided internally to conduct an

1 investigation or not to conduct an investigation or they

2 conducted it and learned certain things and then didn't do

3 anything and they didn't correct any of their behavior, it

4 didn't do anything to then protect their employees, then that

5 would go to showing that the policy they have in place is not

6 reasonable (indiscernible) conducted an investigation, leartned

7 certain things, and then ignored it.

8        THE COURT:  So did you dispute -- I don't know what's

9 there, 56.  I'm going to --

10        MS. GOOTT:  I'm sorry?

11        THE COURT:  I said, obviously, I don't know what

12 documents may exist to their responses, but I will tell you

13 that I'm going to be pretty surprised if they conducted this

14 type of an investigation that they didn't at least attempt to

15 maintain an attorney-client privilege on that.  If they assert

16 the privilege, do you have any reason to argue today that the

17 privilege wouldn't apply?  And I know that you'll need to see

18 specific facts and circumstances, but are you saying that if

19 there's an investigation that was, in fact, privileged, they

20 would also need to be turned over, or is it subject to whether

21 there's a valid privilege claim?

22        MS. GOOTT:  I want to make sure I understand your

23 question.

24        THE COURT:  Okay.

25        MS. GOOTT:  Will you repeat it to me, please?

11

1            THE COURT:  Well, normally, if a publicly-held

2   company conducts an investigation whether there has been an

3   instance of sexual harassment, they are going to try and

4   maintain an attorney-client privilege about that.  Let's assume

5   for a minute that they properly did so and that it was

6   privileged.  If they assert that it is privileged and can prove

7   that it is privileged, do they still need to produce this under

8   some exception to privilege, or would you agree that a proper

9   claim of privilege would apply?

10            MS. GOOTT:  Well, Judge, I don't have an answer.  I

11  don't know.  I haven't --

12            THE COURT:  Okay.

13            MS. GOOTT:  I didn't think about that.  I'm sorry.

14            THE COURT:  That's okay.  Let me hear from

15  Ms. Brinson about these three issues.

16            And then, Ms. Brinson, we'll eventually move to your

17  motion to amend, but let's start wtih the question of

18  discovrey.

19            MS. BRINSON:  Okay, Your Honor.  Are you able to haer

20  me?

21            THE COURT:  I can hear you fine.

22            MS. BRINSON:  Okay.  Your Honor, I first want to

23  point out that (indiscernible) has rejected the exact same

24  argument that (indiscernible) with regard to our company's

25  general policy, regarding its anti-harassment policy, whether

12

1   or not that's relevant.  And you're talking about outside of

2   the context of the specific (indiscernible).  And the cases

3   that Ms. Goott cites to, the three cases that she cites to in

4   her motion, they don't dispute that provision at all because

5   all of those cases, they look at whether or not the policy that

6   the company put in place, whether the company (indiscernible)

7   to prevent or to promptly correct the alleged harassment, but

8   look at it in the context of the specific (indiscernible) at

9   issue and the specific harasser at issue, even if there are

10  more (indiscernible) multiple coworkers who complained about

11  the exact same harasser, but the focus is on the specific

12  plaintiff (indiscernible) and the impact with regard to that

13  specific harasser.

14          There's one case that we cited in our response

15  (indiscernible) American Airlines case in the Northern District

16  of Texas (indiscernible).  In that case, American Airlines

17  filed a motion (indiscernible) protective order against

18  basically the same type of document request that

19  (indiscernible).  In that case, the plaintiff wanted

20  (indiscernible) of all complaints of racial harassment or

21  racially hostile work environment (indiscernible) American

22  Airlines, and that involved -- that would have involved

23  (indiscernible) across the United States.  And the court, in

24  realizing the issue, argued that it is just overbroad,

25  completely overbroad.  And what happened (indiscernible) other

1   than the (indiscernible) related to the affirmative defense,

2   the (indiscernible) defense of whether American Airlines had

3   exercised reasonable care to prevent and correct the alleged

4   harassment.  It also identified (indiscernible) its own

5   conclusion.

6        And so our conclusion is that what -- a general

7   policy, whether or not there are allegations of sexual

8   harassment in -- across the hundreds of locations that iHeart

9   has, (indiscernible) is irrelevant and it's definitely not

10  proportional to the (indiscernible) case, Your Honor.

11       THE COURT:  So we'll talk about proportionality and

12  (indiscernible).  Am I going to end up with a witness from

13  iHeart that says anything about whether these policies and

14  programs were effective or were tendered to be effective for --

15  do stop harassment or do provide a reasonable avenue for

16  employers, or am I simply going to be faced with, here's what

17  we handed in paper, Judge, take it for yourself and we're not

18  going to testify about it?

19       MS. BRINSON:  (Indiscernible) may be testimony, but

20  it would be with regard to whether or not it was reasonable

21  (indiscernible) situation of Ms. Springs because that is what

22  the case (indiscernible).  (Indiscernible) that the

23  (indiscernible), not whether or not, you know, companywide

24  (indiscernible).  The specific circumstances may be different

25  for Ms. Springs because the court looks at whether or not

1  Ms. Springs was aware of the policy, whether or not she was

2  (indiscernible), whether or not she acknowledged ever receiving

3  the policy.  That goes to -- you know, it's specific to her

4  situation as opposed to companywide.

5          THE COURT:  Yeah, no, I understand those.  That's not

6  a witness telling me that they were effective or reasonably

7  designed to be effective or worked in her situation.  Am I

8  going to have a witness that says anything about whether these

9  policies are effectively or merely -- because I don't know how

10  someone would tell me as a fact witness that they were

11  effective in her case.  They can tell me what occurred.  If I'm

12  going to have somebody evaluate whether these policies are

13  reasonably designed to be effective or are effective or

14  (indiscernible) --

15          MS. BRINSON:  No, Your Honor.  I mean --

16          THE COURT:  I want to know what your defense is going

17  to be.

18          MS. BRINSON:  Understood.  And I don't anticipate

19  that there would be that type of argument because that's not

20  what the company would have to show (indiscernible) affirmative

21  defense.  The company would just have to show that it took

22  reasonable care.  It doesn't have to prove that the policies

23  were  -- the policy, you know, generally were effective.

24  (Indiscernible).

25          THE COURT:  I don't know (indiscernible) reasonable

1  care.  Is all I'm going to get the written policies or is

2  somebody going to tell me something about reasonable care

3  within those policies?

4          MS. BRINSON:  Right.  It's going to be focused on

5  (indiscernible), and then that's it.  And the reasonableness is

6  going to go to, you know, that the policy was put in place and

7  (indiscernible) the company provided the policy in its employee

8  handbook to its employees in that office and that the employees

9  are required to read and acknowledge (indiscernible) of the

10  policy.  (Indiscernible) with regard to the reasonable care

11  that the company (indiscernible).

12          THE COURT:  Those are different.  Those are

13  different.  And that's why I'm trying to push you pretty hard

14  on this.  Something that objectively says, here is the policy.

15  People have to sign it, people have to read it.  Those don't

16  tell me whether it works, doesn't work, or reasonably designed

17  or effective.  They just give me three hard facts, a policy,

18  she signed it, she read it.  No one telling me that's

19  good/bad/indifferent, works/doesn't work.  I can have a witness

20  that says it's good/bad/indifferent, works/doesn't work.

21          MS. BRINSON:  (Indiscernible), Your Honor, I'm not

22  too sure that there would be a witness that would tell you that

23  it was good, bad, or indifferent.

24          THE COURT:  So just a witness that says -- I don't

25  even need a witness, I don't think, because I think that

1  Ms. Goott's going to admit -- I believe, and we'll ask her --

2  that the policies were in writing and that Ms. Springs was

3  supposed to read them and that she acknowledged them.  So why

4  do I need a witness at all?

5          MS. BRINSON:  (Indiscernible), Your Honor.  I mean,

6  (indiscernible) -- and I'm not -- you know, I have to dig a

7  little bit more into some of the facts, but generally, these

8  types of cases, you know, (indiscernible) testify that the

9  person was (indiscernible) with regard to the specific policy

10  at issue.

11          THE COURT:  Let's assume that this (indiscernible)

12  these are objective things to which we're going to get

13  stipulations.  Don't need a witness, (indiscernible).

14          MS. BRINSON:  That's right, Your Honor.

15          THE COURT:  In terms of your affirmative defense,

16  other than what will be stipulated facts, am I going to have

17  any witnesses?

18          MS. BRINSON:  (Indiscernible) that there is no

19  witnesses at this time, not on that particular point, no.

20          THE COURT:  On which point would there be a witness?

21  Who's going to tell me anything other than -- if you're right

22  about what this is, don't I really just end up with two

23  witnesses?

24          MS. BRINSON:  You're talking about Ms. Springs and

25  the (indiscernible) witnesses?

1        THE COURT:  Mr. McNair and Ms. Springs.  Under your

2   theory of what this affirmative defense entails, do I end up

3   with merely two witnesses?  You're telling me that this is all

4   kept secret, so who can tell me anything else?

5        MS. BRINSON:  Well, that's right, Your Honor.

6   (Indiscernible) based on what Ms. Springs has testified to date

7   is that (indiscernible) was against Mr. McNair.

8        THE COURT:  So I'll have two witnesses then?

9        MS. BRINSON:  I'm sorry, Your Honor?

10       THE COURT:  Will I only have two witnesses?

11       MS. BRINSON:  I can't say that as I sit here toady.

12   I would think -- because she also questioned the reasons for

13   her termination, we may have (indiscernible) the two

14   individuals who made the decision to fire her,

15   Mr. (indiscernible) and Mr. (indiscernible).

16       THE COURT:  You're right.  Okay, fair.  Okay.  Well,

17   do you want to move through your argument, and then we'll

18   figure out what we're going to do.

19       MS. BRINSON:  Okay, Your Honor.  Okay.  Just to make

20   sure I understand (indiscernible) iHeart's amended motion.  Do

21   you want me to clarify the amended order?

22       THE COURT:  No, no.  I want -- I interrupted you when

23   you were making your argument in response to (indiscernible),

24   and I do want to deal with the production question, and then

25   we'll go to the motion (indiscernible).  I want to let you

1  finish your argument.

2        MS. BRINSON:  Okay.  I'm going to -- with regard to

3  the relevance, I don't need to address that issue.  Can we move

4  on to whether or not (indiscernible)?

5        THE COURT:  Sure.

6        MS. BRINSON:  Well, our position is that their

7  requests are not proportional to the case because they don't

8  involve any issues that are, you know, important to

9  (indiscernible).  Ms. Springs is alleging, you know, sexual

10  harassment (indiscernible) two different theories.  And there's

11  no requirement per the case law that she make a (indiscernible)

12  one happened in her case or (indiscernible) another case.

13  That's not a requirement of a sexual harassment suit under

14  either theory.  It's focused on whether or not she was a part

15  of a protected group, whether or not she was subject to

16  unwelcome harassment, whether or not she experienced some type

17  of tangible employment action, and (indiscernible) supervisor

18  (indiscernible).

19        But the questions, you know -- in (indiscernible)

20  complaint (indiscernible) reflect the (indiscernible) not just

21  harassment complaints.  I believe that (indiscernible), you

22  know, (indiscernible) companywide, then you're talking about a

23  company that has, you know, more than 150 locations over more

24  than a six-year period of time before (indiscernible).  We

25  don't feel that that's proportional.

1          Now, we did inform counsel for Ms. Springs that there

2    was (indiscernible) complaint alleged -- another complaint

3    alleged against Mr. McNair and that there had been no

4    complaints alleged in the New Orleans office since January 1 of

5    2017.  Ms. Springs was terminated in 2018, so that's a year

6    before she was terminated.

7          THE COURT:  All right.  So you cited to me the Fifth

8    Circuit case dealing with AT&T.  And what the Fifth Circuit

9    held was that in order to assert the defense, AT&T was required

10   to show that it dealt with the complaints that it received

11   swiftly and effectively (indiscernible) Fifth Circuit

12   (indiscernible).  If all that you tell me is you had policies,

13   how are you planning to meet your burden?

14          MS. BRINSON:  Well, (indiscernible) that AT&T met its

15   burden (indiscernible) whether or not it dealt with the

16   policies -- the harassment at that particular location, but

17   (indiscernible).

18          THE COURT:  But if you -- you have to demonstrate

19   that the policies are implemented swiftly and effectively.  I

20   don't know how you do that with all I hear is that the policy

21   is (indiscernible).

22          MS. BRINSON:  Okay.  I understand what you're saying.

23   The (indiscernible) of the first element that the affirmative

24   defense is whether or not the company promptly corrected the

25   alleged harassment (indiscernible) to the specific

1  (indiscernible).  The --

2        THE COURT:  I'm (indiscernible) general statement

3  about what your burden was.  That was not (indiscernible)

4  specific (indiscernible).

5        MS. BRINSON:  (Indiscernible) have to refer back

6  specifically to that case.

7        THE COURT:  (Indiscernible) controlling case.  Every

8  other case that I get cited is either from a different circuit

9  or it's an unpublished lower court opinion.  So the only

10  published opinion that I have, the most important one is

11  Casiano, and I think that's (indiscernible).

12        Let me tell you all what I think I need to do to -- I

13  do think that asking for nationwide discovery may not be

14  proportionate to the nature of the dispute.  But I think that

15  it is -- it borders on frivolous to say that we start in 2017,

16  six months before this employee is hired.  I'm going to, unless

17  I hear a good argument to the contrary, grant the motions to

18  compel 15,37, and 56 with the following restrictions.  The

19  inquiry is limited to the Gulf Coast states of Mississippi,

20  Texas, Alabama, and Louisiana.  It will start three years prior

21  to the first date of her employment and end one year after the

22  date of her termination.

23        I think that tells me generally whether these kinds

24  of policies are effective in the relevant area, which I don't

25  think is one little office in New Orleans.  It's bigger than

1  that.  And it may be that after we explore the four states,

2  I'll have to come back and do more, but I'm trying to make this

3  proportionate both as to time and to place.  But because of my

4  reading of <u>Casiano</u> and because there is a burden in order to

5  deal with this defense, I need to decide whether it was swift

6  and effective, and I don't believe that the affirmative defense

7  works just by looking at the one situation.  That's not

8  instructional from the Fifth Circuit.

9          If anyone wants to argue either side of that,

10 (indiscernible) please proceed to do so.

11          All right.  I'm going to take that silence as not

12 thinking it's a totally irrational ruling anyway.  That's going

13 to be the ruling.  I'm granting the motion to compel, limiting

14 it to four states.  I'm going to get to the (indiscernible)

15 that I talked about.  That's going to be without prejudice to

16 either party seeking to open it up to four.  It may be, for

17 example, that the record in those four states is miserable and

18 iHeart thinks that they ought to be entitled to more so that --

19 or (indiscernible) more so that it can show that generally

20 (indiscernible).  It may be that the policies worked for eight

21 of those states and that there's an argument that says, well,

22 we should be allowed to look (indiscernible).  But I think

23 limiting to those four states, one of which is outside of

24 Louisiana and highly populated, should (indiscernible).

25          Let's talk about the motion to amend then.

1 Ms. Brinson, go ahead.

2          MS. BRINSON:  (Indiscernible), Your Honor.  Your

3 Honor, you know, (indiscernible).

4          THE COURT:  I can hear you fine.

5          MS. BRINSON:  (Indiscernible) counsel for Ms. Springs

6 contacted the Court during (indiscernible) counsel for iHeart

7 was asking inappropriate deposition questions.  And counsel for

8 iHeart also complained about counsel for Ms. Springs

9 alleging -- or objecting (indiscernible) objections

10 (indiscernible) depositions.  So the Court asked that the

11 parties (indiscernible) for their depositions.  (Indiscernible)

12 response from the Court after reviewing those excerpts

13 (indiscernible) Court issued the order, Docket Number 4041.

14 And that order imposes (indiscernible) against counsel for

15 iHeart and prevents counsel from questioning Ms. Springs about

16 any sexual conduct or experiences (indiscernible) making a

17 statement in her presence about sexual conduct or experiences,

18 her sexual conduct or experiences (indiscernible).  And it

19 (indiscernible) any future depositions taken (indiscernible) be

20 able to ask (indiscernible) reasonable followup questions from

21 counsel for Ms. Springs raises issues that are limited by this

22 order.

23          It is iHeart's position that basically we're seeking

24 that the Court amend, clarify, or vacate that order, Docket

25 Number 4041, for the following reasons:  Number one, it

1  presents iHeart from conducting the discovery that's necessary

2  to defend against Ms. Springs's sexual harassment suit brought

3  against iHeart.  One of the (indiscernible) elements

4  (indiscernible) is that the sexual harassment (indiscernible)

5  theory is that the alleged harassment was (indiscernible).  The

6  case law is very clear, Your Honor, that the type of questions

7  that Mr. Zimmerman asked Ms. Springs in her deposition about

8  the specific details of each sexual -- alleged sexual

9  encounter, while they may be a very sensitive topic and

10 extraordinarily, you know, (indiscernible) topic, that type of

11 discovery is permissible in the context of a sexual harassment

12 case because it's directly relevant to issues such as whether

13 the conduct was welcome (indiscernible).  It's (indiscernible)

14 goes directly to whether or not the plaintiff, by her -- his or

15 her conduct, indicated that the alleged conduct was unwelcome

16 and that it -- (indiscernible) difficulties with regard to

17 proof.  And so (indiscernible) credibility determination that

18 (indiscernible).

19        In order for the trier of fact to be able to do that,

20 then (indiscernible) detail what occurred.  You can't -- we

21 anticipate (indiscernible) Mr. McNair will testify completely

22 differently than (indiscernible) that the alleged conduct was

23 welcomed and that it was -- (indiscernible) that conduct

24 (indiscernible) trier of fact, the Court, to make that

25 determination is that (indiscernible) iHeart (indiscernible)

1  what are the details with regard to each incident, what

2  situation -- what was the context of each alleged incident, how

3  did it occur, where did it occur, how did each person respond,

4  you know, what did (indiscernible), what did Ms. Springs do to

5  indicate that the conduct was unwelcome, that --

6          THE COURT:  And who besides Mr. McNair do you think

7  has that information?

8          MS. BRINSON:  I'm sorry, Your Honor?  I could not

9  hear you.

10         THE COURT:  Sorry.  Is it only Mr. McNair that you

11 need to talk to about that?

12         MS. BRINSON:  Other than Ms. Springs, yes.

13         THE COURT:  Okay.  I will just tell you that I think

14 I made a mistake in the order limiting you from asking

15 questions to Mr. McNair.  I need to hear Ms. Goott's answer to

16 that, but I agree, in generally, that if the questions are

17 asked in the correct manner that you need to be able to take

18 his deposition and you need to learn whether these were welcome

19 or (indiscernible).

20         Part of the offensive conduct that occurred was

21 Mr. Zimmerman repeating and parroting and characterizing things

22 in his questions rather than merely asking questions.  He can

23 ask questions, but I'll hear from Ms. Goott as to why this

24 shouldn't occur.  If he asks questions of Mr. McNair, he

25 doesn't get to start with his characterization of what

1 Ms. Springs said.  He can ask direct questions about, you know,

2 what happened next, what did she do, what did you do, without

3 repeating acts of sexual conduct in his questions in a manner

4 that is -- was defensive.  So I wanted to see it in context.

5         So I'll let you finish your argument, but I will tell

6 you that I lean very strongly towards believing that I -- the

7 Court was fair about Mr. -- I'm sorry, about Mr. McNair.

8         MS. BRINSON:  (Indiscernible), Your Honor.  With

9 regard to Mr. Zimmerman and the way that he asked his

10 questions, Your Honor, (indiscernible) sexual harassment cases,

11 you know, it's very difficult to establish those types of

12 boundaries because, for instance, there were incidences in the

13 deposition where Mr. Zimmerman would simply say (indiscernible)

14 what happened (indiscernible) further guidance or context as to

15 what specific act in, you know, act in hotel that occurred,

16 that he was asking the followup question about what specific

17 portion of, you know, their specific conduct, what timing

18 (indiscernible) he was asking about.  And so my reading --

19         THE COURT:  Not at the end when Mr. Patterson stopped

20 him.  At that point, there was some confusion.  He was going

21 through a litany of the facts.  That's why it was appropriate

22 to stop it at that point, and that's why it was wrong

23 (indiscernible).  I agree, and I put it in the order, and I

24 tried to say it.  Early on in the deposition, I do think he was

25 following appropriate questions.  But at the point when

1 | Mr. Patterson stopped it, we had well crossed that.

2 |       MS. BRINSON:  Your Honor, if I may --

3 |       THE COURT:  Go ahead.

4 |       MS. BRINSON:  -- (indiscernible) in listening to the

5 | video expert, the portion where Ms. Goott and Mr. Patterson,

6 | you know, stated that they'd like to stop the deposition to

7 | call, it had to be that whether, I believe, Mr. Zimmerman asked

8 | about the length of time that the sexual intercourse occurred

9 | and then talking about the third or the fourth -- third or --

10 | three or four sexual encounters between Ms. Springs and

11 | Mr. McNair.  And so the questions that he asked (indiscernible)

12 | when you look at the transcript, they were the same types of

13 | questions.  He asked how long that the sexual (indiscernible)

14 | he asked that exact question when he asked Ms. Springs about

15 | the sexual -- second encounter she described, which was at --

16 | she claims was at Mr. McNair's home.

17 |       And then, another (indiscernible) that was

18 | (indiscernible) by either Ms. Goott or Mr. Patterson, they

19 | asked the same questions, Your Honor.  And in response to

20 | Ms. Springs identifying the duration of the oral sex

21 | (indiscernible) that occurred at Mr. McNair's house, and then

22 | in response, Mr. Zimmerman asked, well, how long was the sexual

23 | intercourse portion of the interaction.  (Indiscernible)

24 | happened at the third encounter, which was in the hotel, and it

25 | was at that point that Mr. Patterson and Ms. Goott raised an

1  objection.  It was the same series of questions, how long,

2  (indiscernible), what did you say, what did he say, and he

3  repeated what she said (indiscernible) and in the deposition,

4  you know, (indiscernible).  Both parties are clear that the

5  (indiscernible) -- question is clear (indiscernible) the

6  question, what happened -- the specific fact that happened

7  next.

8           And we could not identify, you know, any case law

9  that said that that was inappropriate.  There was a District

10 Court of Kansas case, (indiscernible) court looked at, you

11 know, specific questions that were appropriate.  And the court

12 said, you know, it really focused on the balancing act of

13 whether the questions -- the probative value of the questions

14 essentially outweighed the potential unfair prejudice on the

15 parties -- on the -- from the plaintiff.  And (indiscernible)

16 very similar questions (indiscernible), did you have sexual

17 intercourse with the harasser, you know, on (indiscernible),

18 did he show you condoms, you know, prior to the interaction.

19 And then, the court (indiscernible) details of that case

20 (indiscernible) are the types of questions that were fine.  The

21 only types of questions (indiscernible) case law prohibit are

22 questions that go to, you know, the predisposition of the

23 plaintiff, whether or not the plaintiff (indiscernible) outside

24 sexual encounters (indiscernible) that are separate from the

25 workplace allegations that the plaintiff (indiscernible).

1          And so we do feel that the questions were

2   (indiscernible).

3          THE COURT:  Thank you.

4          Ms. Goott, go ahead, please.

5          MS. GOOTT:  Well, can you hear me, Your Honor?

6          THE COURT:  Yes, I can hear you.

7          MS. GOOTT:  The Court already listened to the video,

8   so I don't think we need to go in it.  But it is far beyond the

9   words which were inappropriate, but it was the conduct and the

10  way that he spoke, and it was wholly inappropriate and

11  demeaning, which is why we stopped it.  And (indiscernible) but

12  the specific -- I don't object to the Court amending the order

13  as it relates to Mr. McNair.

14         THE COURT:  All right.  I agree totally with what

15  Ms. Goott just said.  It was not the subject matter of the

16  questions that (indiscernible).  It was the manner of asking

17  the questions which was so completely inappropriate

18  (indiscernible) point at which the deposition was terminated.

19         The deposition, as to those questions, remains

20  terminated.  iHeart had its chance.  iHeart decided that it

21  would use its chance to (indiscernible) to me, Ms. Springs

22  (indiscernible) resume the deposition as for those kinds of

23  questions.  The order stands as to her.

24         The order, however, is amended as to Mr. McNair.

25  iHeart is free to take his deposition.  iHeart should follow

1  (indiscernible) just stick to (indiscernible) ask his questions

2  in a manner that's not demeaning to Ms. Springs.  He can ask

3  objective questions.  If it starts characterizing what

4  Ms. Springs said, you're going to run into problems with me.

5  That doesn't mean you can't have "she said X in her deposition,

6  what is your response."  That's not characterizing.  That's

7  fair game.  But be careful that it is (indiscernible).

8          Those are going to be the Court's two rulings, and I

9  appreciate everybody in a difficult setting situation.

10  (Indiscernible) these hearings.

11          I'll get an amended order out, and then

12  (indiscernible).  Thank you.  We'll go ahead and --

13          MS. GOOTT:  Thank you, Your Honor.

14          MS. BRINSON:  Thank you, Your Honor.

15      (Proceedings concluded at 10:21 a.m.)

16                      * * * * *

17

18

19

20

21

22

23

24

25

30

1            **C E R T I F I C A T I O N**

2

3            I, Alicia Jarrett, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter, and to the best of my ability.

7

8

9

10  _____

11  ALICIA JARRETT, AAERT NO. 428     DATE:  April 15, 2020

12  ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25



**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
04/23/2020

| | | |
|---|---|---|
| **IN RE:** | § | |
| **IHEARTMEDIA, INC.,** *et al* | § | **CASE NO: 18-31274** |
| | § | |
| **IHEARTCOMMUNICATIONS, INC.** | § | **CASE NO: 18-31273** |
| | § | |
| **IHEARTMEDIA CAPITAL I, LLC** | § | **CASE NO: 18-31275** |
| | § | |
| **IHEARTMEDIA CAPITAL II, LLC; fka** | § | **CASE NO: 18-31276** |
| **CLEAR CHANNEL CAPITAL II, LLC** | § | |
| | § | |
| **AMFM BROADCASTING LICENSES LLC** | § | **CASE NO: 18-31277** |
| | § | |
| **AMFM BROADCASTING, INC.** | § | **CASE NO: 18-31278** |
| | § | |
| **AMFM OPERATING, INC.** | § | **CASE NO: 18-31279** |
| | § | |
| **AMFM RADIO LICENSES, LLC** | § | **CASE NO: 18-31280** |
| | § | |
| **AMFM TEXAS BROADCASTING, LP** | § | **CASE NO: 18-31281** |
| | § | |
| **AMFM TEXAS LICENSES, LLC** | § | **CASE NO: 18-31282** |
| | § | |
| **AMFM TEXAS LLC** | § | **CASE NO: 18-31283** |
| | § | |
| **CAPSTAR RADIO OPERATING** | § | **CASE NO: 18-31284** |
| **COMPANY** | § | |
| | § | |
| **CAPSTAR TX, LLC** | § | **CASE NO: 18-31285** |
| | § | |
| **CC BROADCAST HOLDINGS, INC.** | § | **CASE NO: 18-31286** |
| | § | |
| **CC FINCO HOLDINGS, LLC** | § | **CASE NO: 18-31287** |
| | § | |
| **CC LICENSES, LLC** | § | **CASE NO: 18-31288** |
| | § | |
| **CHRISTAL RADIO SALES, INC.** | § | **CASE NO: 18-31289** |
| | § | |
| **CINE GUARANTORS II, INC.** | § | **CASE NO: 18-31290** |
| | § | |
| **CITICASTERS CO.** | § | **CASE NO: 18-31291** |
| | § | |
| **CITICASTERS LICENSES, INC.** | § | **CASE NO: 18-31292** |

**Exhibit C**

| | § | |
|---|---|---|
| **CLEAR CHANNEL BROADCASTING LICENSES, INC.** | § § | **CASE NO: 18-31293** |
| | § | |
| **CLEAR CHANNEL HOLDINGS, INC.** | § § | **CASE NO: 18-31294** |
| | § | |
| **CLEAR CHANNEL INVESTMENTS, INC.** | § | **CASE NO: 18-31295** |
| | § | |
| **CLEAR CHANNEL METRO, INC.** | § § | **CASE NO: 18-31296** |
| | § | |
| **CLEAR CHANNEL MEXICO HOLDINGS, INC.** | § § | **CASE NO: 18-31297** |
| | § | |
| **CLEAR CHANNEL REAL ESTATE, LLC** | § § | **CASE NO: 18-31298** |
| | § | |
| **CRITICAL MASS MEDIA, INC.** | § § | **CASE NO: 18-31299** |
| | § | |
| **IHEARTMEDIA + ENTERTAINMENT, INC.** | § § | **CASE NO: 18-31300** |
| | § | |
| **IHEARTMEDIA MANAGEMENT SERVICES, INC.; aka CLEAR CHANNEL MANAGEMENT SERVICES, L.P.; aka CLEAR CHANNEL MANAGEMENT SERVICES, INC.** | § § § § § § | **CASE NO: 18-31301** |
| | § | |
| **IHM IDENTITY, INC.** | § § | **CASE NO: 18-31302** |
| | § | |
| **KATZ COMMUNICATIONS, INC.** | § § | **CASE NO: 18-31303** |
| | § | |
| **KATZ MEDIA GROUP, INC.** | § § | **CASE NO: 18-31304** |
| | § | |
| **KATZ MILLENNIUM SALES & MARKETING, INC.** | § § | **CASE NO: 18-31305** |
| | § | |
| **KATZ NET RADIO SALES, INC.** | § § | **CASE NO: 18-31306** |
| | § | |
| **M STREET CORPORATION** | § § | **CASE NO: 18-31307** |
| | § | |
| **PREMIER NETWORKS, INC.; fka PREMIER RADIO NETWORKS, INC.** | § § | **CASE NO: 18-31308** |
| | § | |
| **TERRESTRIAL RF LICENSING, INC.** | § § | **CASE NO: 18-31309** |
| | § | |
| **TTWN MEDIA NETWORKS, LLC; fka METRO NETWORKS** | § § | **CASE NO: 18-31310** |

2 / 3

| | |
|---|---|
| **COMMUNICATIONS, INC** | § |
| | § |
| **TTWN NETWORKS, LLC; aka METRO** | §    **CASE NO: 18-31311** |
| **NETWORKS, INC.** | § |
| | §    **Jointly Administered Order** |
|    **Debtor(s)** | § |
| | §    **CHAPTER 11** |
| | § |

### <u>ORDER DENYING MOTION TO AMEND</u>

    iHeart, by regurgitating arguments previously made, seeks an amendment of this Court's discovery order. The motion is denied. iHeart must provide the discovery within 14 days.

    SIGNED **April 23, 2020.**

Marvin Isgur<br>
UNITED STATES BANKRUPTCY JUDGE

| | |
|---|---|
| **From:** | Miriam Goott <mgoott@walkerandpatterson.com> |
| **Sent:** | Monday, April 20, 2020 9:49 AM |
| **To:** | Zimmerman, Brian W. |
| **Cc:** | Johnie Patterson |
| **Subject:** | [EXTERNAL] Scheduling Order |
| **Attachments:** | Amended to BZ.doc |

**[Warning] This E-mail came from an External sender. Please do not open links or attachments unless you are sure it is trusted.**

Brian,

I think we need to amend the scheduling order and extend discovery deadlines based on the fact that we have depositions to schedule and cant until we know when the current health situation changes.

At a minimum we still need to depose Martini and Lerma. We may also need to schedule more depos depending on what is produced by iHeart in response to the Court's last order. I also presume you will want to depose McNair. We are also still waiting on iHeart's responses and I need to respond to your second set of discovery requests.

I have attached a draft of an amended scheduling order. Let me know what you think.  Please redline any changes. I assume the Court will be flexible with us since everything has been pushed back.

Thanks,
Miriam

*Walker & Patterson, P.C.*
*P.O. Box 61301*
*Houston, TX  77208*
*713.956.5577*
*713.956.5570 fax*

**Exhibit D**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| IHEARTMEDIA, INC., *et al.*,[1] | § § | Case No. 18-31274 (MI) |
| Reorganized Debtors. | § § § | (Jointly Administered) |

**AMENDED SCHEDULING ORDER REGARDING OBJECTION TO CLAIM
OF SAMANTHA SPRINGS [CLAIM NO. 4014]**

Accordingly, under authority of Fed. R. Bankr. P. 7016 and Fed. R. Civ. P. 16, it is

hereby **ORDERED** that the following deadlines and settings shall apply in the above contested

matter:

| Event: | Deadline: |
|---|---|
| Joinder | October 30, 2019 |
| Initial disclosures pursuant to Rule 26(a)(1) | October 30, 2019 |
| Expert disclosures pursuant to Rule 26(a)(2) | July 20, 2020 |
| Rebuttal Expert Disclosures (including rebuttal reports) | November 20, 2020 |
| Completion of any discovery | January 23, 2021 |
| Pre-trial Hearing | Will call Court and get back to you with dates. |
| Exchange of Witness Lists, Exhibit Lists, and Exhibits | 14 days before trial |

---

[1]     Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been
granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers
is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims,
noticing, and solicitation agent at https://cases.primeclerk.com/iheartmedia. The location of Debtor iHeartMedia,
Inc.'s principal place of business and the Debtors' service address is: 20880 Stone Oak Parkway, San Antonio,
Texas 78258.

| Trial | Will call Court |
|---|---|

AGREED AND ACCEPTED:


*/s/*
Brian W. Zimmerman
State Bar No. 00788746
FBN: 18979
SPENCER FANE LLP
3040 Post Oak Blvd., Suite 1300
Houston, Texas 77056
Telephone: 713-212-2651
Facsimile: 713-963-0859
bzimmerman@spencerfane.com

*Co-Counsel to the Reorganized Debtors*


*/s/ Miriam Goott*
Miriam Goott
SBN 24048846
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208
(713) 956-5577 (telephone)
(713) 956-5570 (fax)
mgoott@walkerandpatterson.com

*Counsel for Ms. Springs*